IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. YIEL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

YIEL K. YIEL, APPELLANT.

Filed October 15, 2019.    No. A-18-1144.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Shawn Elliott for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

RIEDMANN, Judge.

INTRODUCTION

Yiel K. Yiel appeals his conviction in the district court for Lancaster County for burglary. On appeal, he asserts that the district court should not have allowed two witnesses to make in-court identifications of him, that the evidence was insufficient to sustain the conviction, and that he received an excessive sentence. Finding no merit to the arguments raised on appeal, we affirm.

BACKGROUND

In the early morning hours of September 23, 2017, a burglary occurred at a residence located in the "North Bottoms" area of Lincoln, Nebraska. At the time, there were five residents of the home, including Beau Schindler and Justin Kershaw. Schindler's girlfriend, Bailey Streff, was staying overnight with him that evening. Schindler and Kershaw each occupied a bedroom in the basement of the house, and there was also a laundry room in the basement.

- 1 -

Around 3:30 a.m., Kershaw woke up to the sound of someone trying to open his bedroom door, which was locked. He got up, opened the door, and found a black male standing in the hallway. Kershaw asked him what he was doing, and the man replied, "Nothing." Kershaw then closed the door and went back to bed.

A short while later, while Streff and Schindler were asleep in Schindler's bedroom, Streff was awakened by the sound of someone rummaging through her purse, which was at the foot of the bed. She asked "who are you" and the person turned on the light in the room and looked at her and Schindler. Schindler woke up after hearing Streff speak and, not recognizing the man at the foot of the bed, jumped up and chased him out of the room. Streff estimated that the man was in the bedroom for 20 or 25 seconds, and after he turned the light on, she was able to see all of his body and his face. The man ran out of the room when Schindler started chasing him, but shortly thereafter, he came back and stood in the doorway of Schindler's bedroom looking at Streff. Streff could again see his face, because the lights in the bedroom and hallway were on. The man stood there for about 15 seconds before running off, up the stairs. Streff then called 911.

After the burglar fled, Streff, Schindler, and Kershaw discovered a wallet on the floor of the laundry room containing an identification (ID) card with Yiel's name and photo on it. Streff, Schindler, and Kershaw compared the photo on the ID card to the man they had seen inside the house, and when police responded to their 911 call, they told the officer that they believed the man in the photo on the ID card was the same man who had just been inside the house.

The responding officer discovered that a television had been moved from a bedroom to the kitchen near the back door and another television had been moved from the living room to outside the back door in a parking area. Streff's driver's license was missing from her purse and was never recovered, and one of the roommates was missing a laptop, some shoes, a bag, and some clothing.

Approximately an hour after Streff called 911 to report the burglary, Yiel called 911 to report that he had lost his wallet earlier the previous night. His call to law enforcement was made at 5:18 a.m. and he explained that he had been at a couple of bars, but he was unable to buy a drink because someone took his wallet. After the officer investigating the burglary left the residence, he went to Yiel's parents' house to talk to Yiel about his missing wallet. Yiel explained that he had been to a couple of bars, returned to his parents' house about 12:30 a.m., and when he tried to call in an order for food delivery, he realized his wallet was missing. Because Yiel's wallet was found inside the residence where the burglary took place, the officer arrested Yiel, and he was ultimately charged with burglary.

Prior to trial, Yiel filed a motion to suppress evidence of identification made by Schindler, Streff, and Kershaw. A hearing was held on the motion, and in a written order, the district court denied the motion. A jury trial was held, and evidence detailing the above events was adduced. In addition, a friend of Yiel testified that around 10 p.m. on September 22, 2017, he had dropped Yiel off in the North Bottoms area.

At trial, Streff described the burglar as someone she did not recognize who was tall with dark skin and not much hair. Schindler also described the burglar as a male with very dark skin and short hair. Streff was asked whether the person she had seen inside the house was in the courtroom, and Yiel objected and renewed his motion to suppress. The court overruled the objection, but allowed Yiel a continuing objection. Streff then identified Yiel as the man she had

seen. Similarly, Schindler was asked whether he recognized anyone in the courtroom, and Yiel again objected and renewed his motion to suppress. The objection was overruled, and Schindler responded that Yiel matches the appearance of the man he saw in the house.

After the conclusion of evidence and deliberation, the jury found Yiel guilty. He was sentenced to 6 to 10 years' imprisonment. Yiel now appeals to this court.

## ASSIGNMENTS OF ERROR

Yiel assigns that the district court erred in (1) permitting Streff and Schindler to make in-court identifications of him, (2) finding sufficient evidence to sustain the conviction, and (3) imposing an excessive sentence.

## STANDARD OF REVIEW

A district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error. *State v. Taylor*, 287 Neb. 386, 842 N.W.2d 771 (2014).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

## ANALYSIS

*Identification Testimony.*

Yiel asserts that the district court erred in allowing Streff and Schindler to make in-court identifications of him. He argues that their identifications of him were highly suggestive and too unreliable to be admissible, and because the district court failed to suppress their identification testimony, he was denied due process. We conclude that the district court did not err in allowing the witnesses to identify Yiel at trial.

An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. *State v. Taylor, supra*. See, also, *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012). Even when police use an identification procedure that is both suggestive and unnecessary, suppression of the resulting identification is not the inevitable consequence. See *Perry v. New Hampshire, supra*. Instead, the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification. *Perry v. New Hampshire, supra*. Reliability of the eyewitness identification is the lynchpin of that evaluation. *Id*. However, the due process check for reliability comes into play only after the defendant establishes improper police conduct. *Id*. The very purpose of the

check is to avoid depriving the jury of identification evidence that is reliable, notwithstanding improper police conduct. *Id.*

In *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015), the defendant raised the same argument that Yiel makes here: an eyewitness identification of him was too unreliable to be admissible. In *Stevens*, a woman was robbed in a parking lot by three masked men. At trial, a cabdriver testified that on the night of the robbery, he had been near the scene of the robbery and three young men had attempted to hire his cab. Over the defendant's objection, the cabdriver testified that he was 50- to 75-percent sure that the defendant was one of those young men. On appeal, the defendant argued that the cabdriver's testimony was too unreliable to be admissible.

Citing *Perry v. New Hampshire, supra*, the Nebraska Supreme Court reiterated that a preliminary finding of the reliability of an eyewitness identification is necessary only when the identification was procured under unnecessarily suggestive circumstances arranged by law enforcement. But the facts before it did not involve an allegedly suggestive pretrial identification arranged by law enforcement. Rather, all that was being challenged was the cabdriver's in-court identification of the defendant. The court recognized that according to *Perry*, in such a situation, it suffices to test reliability through the rights and opportunities generally designed for that purpose, such as the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt. *State v. Stevens, supra.*

Likewise in the present case, there was no law enforcement involvement in the identification procedure. Before law enforcement ever arrived at the residence, Streff, Schindler, and Kershaw identified the man in the photo on the ID card as the man they had seen in the residence. Once police arrived, they reported their opinions to police. Their statements were not in response to any questioning from an officer, and they were not shown a photo lineup or any similar procedure. Thus, the preliminary reliability analysis does not come into play in assessing whether the witnesses' identification testimonies were admissible at trial. Rather, Yiel had the opportunity to challenge the credibility of the witnesses' testimonies through opening statements and closing arguments, cross-examination, and jury instructions, and the record indicates that he did so.

To the extent Yiel argues that the witnesses' identifications of him lacked reliability, the credibility of witnesses is a determination within the province of the trier of fact. See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). Thus, any conflicts in their testimonies or questions concerning the credibility of the witnesses were for the jury to resolve as the finder of fact. See *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). As a result, the district court did not err in allowing Streff and Schindler to identify Yiel at trial.

*Sufficiency of Evidence.*

Yiel next argues that the evidence was insufficient to sustain the burglary conviction. A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value. Neb. Rev. Stat. § 28-507 (Reissue 2016).

On appeal, Yiel does not dispute that a burglary occurred at the residence. In other words, he does not challenge the fact that someone willfully, maliciously, and forcibly broke and entered the residence with intent to commit a felony or steal property of value. And after viewing the evidence in the light most favorable to the prosecution, we agree that the evidence was sufficient to establish that someone burglarized the residence. The burglar entered through the closed back door of the residence. See *State v. McDowell*, 246 Neb. 692, 522 N.W.2d 738 (1994) (opening of closed door is "breaking" for purposes of burglary statute). A laptop, shoes, a bag, and some clothing belonging to one of the residents were missing and never recovered; two televisions in the residence had been moved, including one to an outside parking area; and the burglar was riffling through Streff's purse when she woke up. This evidence establishes that the burglar stole property of value and intended to steal additional property of value.

Rather than challenging the burglary itself, Yiel's argument centers on the identity of the burglar. He claims that when excluding the in-court identifications of him, nothing else places him at or near the scene of the crime, other than his wallet, which he reported stolen. He also notes that his fingerprints did not match any of the fingerprints from the scene, the police did not find any stolen property on him when he was arrested, and the police never sought to search his house for stolen items.

When viewing the evidence in the light most favorable to the prosecution, we find that the jury could have found beyond a reasonable doubt that Yiel was the burglar. As we determined above, Streff and Schindler were properly permitted to identify Yiel as the person they saw inside the residence, and the credibility of their identifications was to be determined by the jury. Although Yiel reported his wallet stolen, the jury could have found that that evidence was not credible, and instead concluded that Yiel dropped his wallet during commission of the burglary. And although police did not locate Yiel near the residence, his friend testified that he dropped Yiel off in the North Bottoms area the night before. We therefore find sufficient evidence to sustain the conviction.

*Excessive Sentence.*

Yiel's final assignment of error alleges that his sentence was excessive. Burglary is a Class IIA felony. § 28-507. A Class IIA felony is punishable by up to 20 years' imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). Thus, Yiel's sentence of 6 to 10 years' imprisonment is within the statutory limits. We therefore review it for an abuse of discretion.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the

sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Yiel was 22 years old at the time of sentencing. He underwent a substance use evaluation as part of the presentence investigation and was diagnosed with severe alcohol use disorder. Yiel recognized his alcohol abuse, noting that many of his past crimes occurred while he was intoxicated. It was recommended that he participate in intensive outpatient treatment.

Yiel's criminal history dates back to 2011, when he was 16 years old. His adult record includes convictions for various offenses including minor in possession, possession of marijuana, false reporting, theft of services, reckless driving, stealing money or goods, attempted possession of a controlled substance, obstructing a peace officer, theft by shoplifting, criminal trespass, and disturbing the peace. He has served jail time ranging from a few days up to a 6-month sentence for a trespassing conviction. While incarcerated, he has been punished on numerous occasions for institutional misconduct, and since he was booked into jail in September 2017 for this offense, he received punishments for institutional misconduct on 12 occasions, 4 of which were classified as major offenses. According to testing conducted during the presentence investigation, Yiel scored as a very high risk to reoffend.

Yiel argues that the district court failed to meaningfully consider certain mitigating circumstances including a previous cancer diagnosis, history of depression and alcohol use, limited criminal history, likelihood that he would respond affirmatively to probation, and the fact that the offense neither caused nor threatened serious harm. Yiel raised these arguments at the sentencing hearing, and it is clear from the record that the court considered the required factors and the information contained in the presentence investigation report.

The district court specifically recognized that Yiel had taken steps toward treatment and rehabilitation and had some community support. However, the court also noted Yiel's young age and his "quite significant" criminal history, including the recent trespass conviction for which he served 6 months in jail. The court also expressed concern about Yiel's ability to conform his behavior in a manner that ensures the safety and security of the community, noting that walking into a house where people are sleeping in order to burglarize the residence is "in no way a minor offense or a minor security threat to [the residents'] well-being." Our review of the record indicates that the district court considered the required factors, including all mitigating information, and explained its reasoning for the sentence imposed. We therefore find no abuse of discretion in the sentence Yiel received.

## CONCLUSION

We conclude that the district court did not err in allowing witnesses to make in-court identifications of Yiel at trial, the evidence was sufficient to sustain the conviction, and the sentence imposed was not an abuse of discretion. As a result, the conviction and sentence are affirmed.

AFFIRMED.